Gregory W. TIMM and Cynthia J. Timm, Plaintiffs–Appellants,

v.

David REITZ, in his official capacity as Director of the Colorado Department of Revenue Division of Racing; and Irving S. Hook, W. Gale Davey, Michael B. Johnson, Gene Naugle, and Arnold L. Mackley, in their official capacities as members of the Colorado Racing Commission, Defendants–Appellees.

No. 00CA1698.

Colorado Court of Appeals, Div. V.

Dec. 6, 2001.

Jacobs Chase Frick Kleinkopf & Kelly, LLC, John R. Webb; Holme Roberts & Owen, LLP, Sherri Keckel Kulmann, John C. Lowrie; American Civil Liberties Union, Mark Silverstein, Simon Mole, Denver, CO, for Plaintiffs–Appellants.

Ken Salazar, Attorney General, Robert H. Dodd, Jr., Assistant Attorney General, Denver, CO, for Defendants–Appellees.

Opinion by Judge CASEBOLT.

In this action challenging the constitutionality of a state regulation mandating random, suspicionless drug testing of licensed dog trainers in the greyhound racing industry, plaintiffs, Gary W. Timm and Cynthia J. Timm, appeal the summary judgment in favor of defendants, David Reitz, the Director of the Colorado Department of Revenue Division of Racing Events (division), and Irving S. Hook, W. Gale Davey, Michael B. Johnson, Gene Naugle, and Arnold L. Mackley, the members of the Colorado Racing Commission. We reverse and remand.

The following facts are undisputed. The division oversees pari-mutuel wagering and all activities concerning greyhound dog races at licensed racing tracks. Plaintiffs are dog trainers licensed by the division to own, lease, train, and care for greyhounds at racetrack kennels.

When a racing event is scheduled at the track, race officials notify the trainers of the particular dogs they want for a given race. The trainers then take the designated dogs to the weigh-in areas near the track. During

the transit to this area, the dogs are kept on leashes and muzzled.

Once the dogs are delivered to the weigh-in, other licensees weigh the dogs. The dog's muzzle is replaced. A veterinarian is present at the weigh-in and observes the health of all dogs. A urine sample is taken from each dog and is later tested for illegal doping and contaminants. The officials check the ear tattoo of each dog to verify identity and place a numbered blanket on each dog. The trainers have no interaction with the dogs after they are tendered to the race officials.

A mechanical lure, operated by another licensee, leads the dogs around the track during the race. Trainers have no access to the track itself. They and the general public are separated from the track by a chain link fence and concrete wall. After the race, other licensees remove the dog's muzzles, and "lead-outs" return the dogs to the trainers, who then return the dogs to the kennels. Trainers have no involvement in handling wagers on the races, actually running races, or judging race results, all of which are handled by other licensees.

In 1999, the division instituted a policy that requires all licensed participants in the greyhound racing industry randomly to provide samples of their urine, which the division tests for the presence of illicit drugs. Submission to the urine tests is required without reasonable cause or suspicion of drug use.

Ms. Timm refused to submit to testing when requested, and the division suspended her license. Mr. Timm submitted to testing under protest and continues to work as a licensed dog trainer.

Plaintiffs' complaint asserted that the random drug testing program as applied to them constituted an unreasonable search in violation of their rights under the Fourth and Fourteenth Amendments of the United States Constitution and under article II, § 7, of the Colorado Constitution. In lieu of an answer, defendants filed a motion to dismiss and shortly thereafter submitted an amended motion requesting summary judgment. The parties presented affidavits, and no discovery was undertaken.

Concluding that the testing program was constitutional, the trial court granted summary judgment for defendants, and this appeal followed.

Plaintiffs contend that the trial court erred in granting summary judgment on their claims. They argue that, drawing all inferences in their favor, there are disputed factual issues that preclude summary judgment or, alternatively, that defendants are not entitled to judgment as a matter of law because they have failed sufficiently to establish on this record a "special need" justifying suspicionless drug testing of randomly selected licensees. We agree with both arguments.

■ We review the grant of summary judgment de novo. *Aspen Wilderness Workshop, Inc. v. Colorado Water Conservation Board,* 901 P.2d 1251 (Colo.1995); *Mohr v. Kelley,* 8 P.3d 543 (Colo.App.2000).

Summary judgment is appropriate only if the pleadings and supporting documents demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The burden is on the moving party to establish that no genuine issue of fact exists, and any doubts in this regard must be resolved against that party. *Aspen Wilderness Workshop, Inc. v. Colorado Water Conservation Board, supra.* The nonmoving party is also entitled to the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts. *City of Aspen v. Marshall,* 912 P.2d 56 (Colo.1996); *Mohr v. Kelley, supra.*

■ A reviewing court applies the same standards as the trial court in determining whether summary judgment is warranted. *Smith v. Boyett,* 908 P.2d 508 (Colo.1995). In that regard, arguments and evidence not presented to the trial court in connection with a motion for summary judgment will not be considered on appeal. *Mohr v. Kelley, supra; see also Lambert v. Haskins,* 128 Colo. 433, 263 P.2d 433 (1953).

Initially, we note that plaintiffs' complaint states claims based on violations of both the United States and Colorado Constitutions' proscriptions on unreasonable searches and seizures. In prior cases that have challenged

the constitutionality of random, suspicionless drug testing programs, the Colorado Supreme Court has analyzed the question solely with reference to the Fourth Amendment. *See Trinidad School District No. 1 v. Lopez,* 963 P.2d 1095 (Colo.1998); *University of Colorado v. Derdeyn,* 863 P.2d 929 (Colo.1993); *see also People v. Rodriguez,* 945 P.2d 1351 (Colo.1997)(state and federal constitutions co-extensive with respect to warrantless searches and seizures). Accordingly, our analysis proceeds under the Fourth Amendment.

■ The Fourth Amendment protects individuals against unreasonable searches and seizures and specifies that a search warrant may issue only upon a showing of probable cause. State compelled collection and testing of urine constitutes a search. A search of the person conducted without a warrant is presumed to be unreasonable and therefore unconstitutional. *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

■ In the context of drug testing that is not based on individualized suspicion, the state bears the burden of overcoming the presumption of unreasonableness. This presumption may be overcome, and a departure from the warrant and probable cause requirement may be authorized, "in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Ferguson v. City of Charleston,* 532 U.S. 67, 74 n. 7, 121 S.Ct. 1281, 1286 n. 7, 149 L.Ed.2d 205, 214 (2001)(quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)(Blackmun, J., concurring)); *Skinner v. Railway Labor Executives' Ass'n, supra; University of Colorado v. Derdeyn, supra.*

■ The special needs exception is a "closely guarded category." *Ferguson v. City of Charleston, supra,* 532 U.S. at 77, 121 S.Ct. at 1288, 149 L.Ed.2d at 216. In determining whether there is a special need that could justify dispensing with the warrant requirement, an important factor is the articulated primary purpose behind the questioned program. And, the special need must be

something other than the general interest in crime control. *See City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000); *Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997).

■ If a special need is found, the court then conducts a balancing test, considering the nature of the privacy interest upon which the search intrudes, the character of the intrusion that is complained of, the nature and immediacy of the governmental concern at issue, and the efficacy of the means for meeting it. *Vernonia School District 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); *Trinidad School District No. 1 v. Lopez, supra.*

■ In conducting the special needs evaluation, courts do not merely look for any governmental interest that could be classified as a special need, but undertake a close review of the record to determine if the actual, programmatic purpose addresses an area of legitimate governmental concern. *Ferguson v. City of Charleston, supra; Chandler v. Miller, supra.*

In cases in which the rationale was found to have met this standard, the articulated interest has been described variously as "important," *Vernonia School District 47J v. Acton, supra,* 515 U.S. at 661, 115 S.Ct. at 2394, 132 L.Ed.2d at 579, "substantial," *Chandler v. Miller, supra,* 520 U.S. at 318, 117 S.Ct. at 1303, 137 L.Ed.2d at 526, or "compelling," *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 668, 109 S.Ct. 1384, 1392, 103 L.Ed.2d 685, 704 (1989); *Skinner v. Railway Labor Executives' Ass'n, supra,* 489 U.S. at 628, 109 S.Ct. at 1419, 103 L.Ed.2d at 667. Although neither the United States Supreme Court nor the Colorado Supreme Court has defined the degree of need required, we note that the Colorado Supreme Court has concluded that a showing of a threat to public safety or national security has generally been involved. *See University of Colorado v. Derdeyn, supra.*

Here, defendants assert three special needs warranting the suspicionless drug testing program for dog trainers: the state's fiscal interest in preserving the integrity of

racing; the welfare of the animals; and the safety of the trainers. They urge that each consideration provides justification for the program. We conclude that, with respect to these asserted rationales, there is either disputed evidence or insufficient evidence in this record to support the finding of a special need.

## I.

■ Any showing of special need for a drug testing program must generally start with evidence of a drug abuse problem among the target group. *See Chandler v. Miller, supra; see also, e.g., Skinner v. Railway Labor Executives' Ass'n, supra; Trinidad School District No. 1 v. Lopez, supra; cf. National Treasury Employees Union v. Von Raab, supra.*

■ Here, defendants have not provided evidence of a drug problem among dog trainers before the program commenced. They did submit a summary of investigations for both horse and dog racing compiled after the first year of the testing program. The summary discloses that 10 of 134 drug tests were positive. However, the summary does not indicate how many, if any, dog trainers were among the licensees who were tested and also does not describe who or what category of persons tested positive. In his affidavit, Mr. Timm asserted that drug abuse is not a pervasive problem among dog trainers. Hence, there is a genuine issue of material fact concerning the existence of a problem that would justify departure from the warrant requirement.

There is also a lack of undisputed evidence demonstrating that drug-impaired dog trainers would imperil any of the interests asserted by defendants. *Cf. Skinner v. Railway Labor Executives' Ass'n, supra* (evidence in the record included documentation of fatalities, injuries, and property damage attributable to train accidents in which alcohol or drug impairment was a factor). Defendants have not presented evidence of any past injury to a dog trainer, an animal, or the general public caused by a drug-impaired trainer. Nor have defendants presented evidence that drug impairment among dog trainers has resulted in some form of corruption that threatens the integrity or financial well-being of dog racing.

In fact, the record is devoid of any reference to any injury caused by, or suffered by, or race corruption attributable to a dog trainer, whether drug-impaired or not. The only evidence in the record relevant to any of these issues is a division investigation report, which states that the division conducted 289 case investigations in 1999, 52 of which resulted in a criminal filing. The report does not indicate what óffenses were charged, how many of them resulted in convictions, or whether any of the criminal filings were against dog trainers. Moreover, it is unclear from the evidence whether dog trainers have ever been involved in any corrupt activity, or whether the type of corruption that has occurred within the industry is of a kind to which drug-impaired dog trainers would be particularly susceptible, or which would threaten the integrity of racing.

Defendants also appended to their answer brief in this court a report summarizing investigations of corruption in the racing industry in 1949. This report is not found in the trial record, however, and we therefore decline to consider it. *See Mohr v. Kelley, supra.*

Defendants ask us to give them the benefit of the inferences to be drawn from the evidence found in the record, but the applicable standard of review compels us to give the nonmoving plaintiffs that benefit. *See City of Aspen v. Marshall, supra; Mohr v. Kelley, supra.* However, even if we were to assign the maximum probative value to defendants' evidence, Mr. Timm's affidavit asserts that dog racing in Colorado has not had an unsavory history, defined as significant events or occurrences that would affect the integrity of the races. His affidavit also asserts that dog races are run cleanly and fairly. These facts, when compared to defendants' claimed rationales, demonstrate the existence of genuine issues of material fact.

Defendants ask us to disregard the lack of historical evidence, insisting that they are entitled to justify the program on the basis of preventing harms that could occur, rather than only reacting after a crisis has manifest-

ed itself. *See Dimeo v. Griffin*, 943 F.2d 679 (7th Cir.1991)(special needs analysis should be forward-looking assessment based on probabilities, rather than a conclusive demonstration of measurable harms). However, even preventive measures must be based on something more than speculation, particularly where the action taken will affect the Fourth Amendment rights of individuals. *See Chandler v. Miller, supra.*

Here, defendants have provided no factual basis from which we can conclude that drug impairment is or could become a problem for dog trainers, or that this hypothetical drug problem could result in harm to animals, trainers, the general public, or the state fisc. Defendants did assert that drug-impaired trainers could jeopardize their own safety or that of other industry participants because of dangers posed by the high-speed mechanical lure, or because a dog's muzzle might come off during the weigh-in process. However, there is no evidence that trainers operate the lure. Further, Mr. Timm's affidavit asserts that trainers have no access to the track and that greyhounds are generally well-behaved animals and that loss of a muzzle would pose no risk of serious injury.

Defendants also asserted that drug-impaired trainers could not protect the health and safety of the animals, but defendants presented no evidence to support that assertion, nor did they demonstrate that past drug impairment of trainers had affected the health or safety of the animals.

We acknowledge that a lack of evidence of past harm does not necessarily preclude a showing of special need where the threatened harm is great and the potential for harm resulting from drug impairment is obvious. *See National Treasury Employees Union v. Von Raab, supra.*

In *Von Raab*, the Supreme Court upheld a program of suspicionless drug testing of United States Customs agents, despite the fact that no evidence was presented of drug use among that group. However, in that case the Court emphasized the "unique" drug interdiction mission of Customs agents, a "compelling" interest that justified the intrusion into agents' privacy caused by the drug testing program. *National Treasury Employees Union v. Von Raab*, 489 U.S. at 674, 109 S.Ct. at 1395, 103 L.Ed.2d at 707. The Court likewise noted the fact that Customs agents' duties required them to carry firearms.

The Court has subsequently cited *Von Raab* as a singular case that uniquely justified departure from the general requirement that the government provide evidence of past drug use, and problems resulting from past drug use, among the target group. *Chandler v. Miller, supra.*

The case before us does not justify such a departure on the evidence in the record. There is nothing to suggest that the duties of a dog trainer are fraught with unique risks that pose substantial threats to public safety or national security. Nor is it apparent that drug impairment would compromise a dog trainer's performance of those duties.

## II.

Defendants contend that the fact that drug impairment will inevitably cause harm to trainers and to the animals in their care is subject to judicial notice. We disagree.

Judicial notice of adjudicative facts is generally limited to matters of public record and to matters of common knowledge that cannot reasonably be disputed. CRE 201(b); *One Hour Cleaners v. Industrial Claim Appeals Office*, 914 P.2d 501 (Colo.App.1995). Examples of the application of the rule include taking notice of a calendar date, an applicable term of office, or an unquestioned law of mathematics. *Prestige Homes, Inc. v. Legouffe*, 658 P.2d 850 (Colo.1983); *see also* CRE 201 committee comment.

While we can take notice that illicit drug use can slow reflexes and impair alertness, judgment, and care, we cannot take notice, as defendants request, that a drug-impaired dog trainer would cause harm to an animal, himself or herself, or the public, or would be more susceptible to corruption. These are not the kind of commonly known "facts" that are beyond dispute and therefore subject to judicial notice.

### III.

█ Defendants argue that testing is nonetheless justified as a means of assuring the public that participants in the racing industry are free from corrupting influences that could affect the integrity of a race. Relying on *Shoemaker v. Handel,* 795 F.2d 1136 (3d Cir.1986), defendants contend that public perception of corruption threatens the state's fiscal interest as much as actual corruption.

The Supreme Court considered and rejected just such an argument in *Chandler,* where the state argued that being able to demonstrate to the public that its elected officials were drug-free was a laudatory end in and of itself. Finding no evidence of an actual drug abuse problem among the target group, and no evidence that drug impairment by a member of the group would threaten public safety, the Court did not permit an exception to the warrant requirement based on this rationale, which it described as "symbolic, not 'special.'" *Chandler v. Miller, supra,* 520 U.S. at 321–22, 117 S.Ct. at 1304–05, 137 L.Ed.2d at 528.

In any event, defendants have not shown that Colorado's racing industry faced a crisis of public confidence prior to the inception of the drug testing program that the program was designed to address. Even if we assume, without deciding, that the state's fiscal interest could in some cases be found to be a special need, and that maintaining public support for racing is essential to preserving the state's fiscal interest, a threat to that support should be real, not hypothetical.

### IV.

█ The trial court relied upon *Dimeo v. Griffin, supra,* and *Shoemaker v. Handel, supra,* in reaching its conclusion that the regulation was constitutional. Defendants argue that we should adopt the findings and conclusions reached in those cases, in which the courts upheld random drug testing of participants in horse racing. We decline to adopt the factual findings of these cases as a substitute for the presentation of evidence in this case, and we do not find the legal conclusions reached there dispositive in this case.

The *Dimeo* court applied the special needs test to random drug testing of horse jockeys. Its conclusion permitting such testing was grounded in the particular circumstances encountered by these jockeys and other race participants, as opposed to any other group involved in animal racing.

Unlike the lack of undisputed evidence here with respect to threats to dog trainers' safety, there was substantial evidence in *Dimeo* concerning the risk of injury and death that jockeys face each time they race and of drug and alcohol abuse by jockeys. The court also noted that a drug-impaired jockey could easily affect the outcome of a race and therefore impair the integrity of the sport. *Dimeo v. Griffin, supra.*

Here, there is no evidence in the record at this point to suggest that trainers face any serious risk of injury, such as the kind of risk associated with riding on and amongst animals that generally weigh over one thousand pounds. *See Dimeo v. Griffin, supra.* And, as previously noted, there is a genuine issue of material fact whether drug abuse is a problem among dog trainers. The relevant evidence in the record here also shows that dog trainers do not participate in races and that dogs are examined by a veterinarian before each race to ensure their fitness for racing and that they have not been given proscribed drugs.

Indeed, the *Dimeo* court itself distinguished testing of jockeys, which it concluded was justified by substantial safety concerns, from testing of animal caretakers, where safety concerns were not implicated. *Dimeo v. Griffin, supra* (citing *Serpas v. Schmidt,* 827 F.2d 23 (7th Cir.1987)). We also reject defendants' contention that, as a matter of law, the reasons that may justify the testing of horse jockeys mandate upholding the drug testing program for dog trainers.

We also question the continuing vitality of the holding of *Shoemaker v. Handel,* which upheld a random drug testing policy that targeted horse jockeys and others, including horse trainers. The decision, rendered before any of the Supreme Court drug testing cases, applied the administrative premises search exception. However, the Supreme

Court has exclusively applied the special needs test in cases involving suspicionless drug testing of persons. In light of this authority, we conclude that the administrative search of premises exception has no application in personal drug testing cases, and we decline to follow *Shoemaker.*

In so doing, we also reject the claim that pervasive regulation of an industry alone can justify a finding of special need. The degree of regulation in an industry or occupation may be considered as a factor in the balancing test, *see University of Colorado v. Derdeyn, supra,* but no Supreme Court drug testing cases have held that it suffices by itself.

### V.

■ Independent of our conclusion that there are issues of material fact precluding summary judgment, we also conclude that defendants have not demonstrated on this record that the interests asserted in their briefs were the actual purposes that justified the program at its inception.

In reviewing the program at issue for a "special need," we must consider evidence of the actual programmatic purpose, rather than rationales submitted after the fact for purposes of argument. *See Chandler v. Miller, supra.*

The Supreme Court has held that, in cases involving suspicionless searches instituted pursuant to a general scheme, the abuse of individual rights may lie as much or more in the reason for conducting a search as in the manner of the search itself. "[A] program driven by an impermissible purpose may be proscribed while a program impelled by licit purposes is permitted, even though the challenged conduct may be outwardly similar." *City of Indianapolis v. Edmond, supra,* 531 U.S. at 47, 121 S.Ct. at 457, 148 L.Ed.2d at 347.

In *Edmond,* the Court struck down a program of highway checkpoints used for the purpose of drug interdiction, despite the government's argument that the program could have been justified under the rationale of checking driver's licenses and registration. The Court rejected that argument and looked only to the actual, primary purpose of drug interdiction, which it concluded did not justify a suspicionless search.

Likewise, in *Ferguson v. City of Charleston, supra,* the Court's most recent review of a suspicionless drug testing program, the Court rejected the government's argument that a post hoc rationale for the program could suffice as a special need, when the actual programmatic purpose did not.

In that case, the city government had enlisted hospitals in an effort to test pregnant female patients for the presence of illegal drugs, with the programmatic purpose of collecting evidence for criminal prosecution of those patients. The city contended that the Court should consider the ultimate purpose of the program to be protecting the health and welfare of the mother and child. Relying on a close review of the record concerning the program's purpose during its development, the Court concluded that it was the purpose of crime control, rather than the purpose of public health, that provided the impetus for the program. Accordingly, the Court struck down the drug testing program as unconstitutional.

Here, defendants offer numerous rationales that could be used to support the drug testing program, but provide no record evidence to show that any of these reasons supplied the actual basis for the program at its inception.

Defendants argue that the state statute, § 12–60–101, C.R.S.2001, concerning regulation by the division provides evidence of the purposes behind the program. However, the declaration of legislative purpose contained in the statute concerns the regulation of racing generally and does not speak to the particular reasons for the drug testing program at issue.

Defendants also assert that the purpose for the program can be found in the written policy containing the procedures for testing. However, the document that defendants have appended to their appellate brief as the written policy is not published in an official state publication so that it could be judicially noticed. *Cf. One Hour Cleaners v. Industrial Claim Appeals Office, supra* (regulations

contained in Code of Colorado Regulations may be judicially noticed). Because it is not in the record and was not submitted to the trial court, we decline to consider it. *See Mohr v. Kelley, supra.*

Defendants have also failed to provide any record evidence of the programmatic purpose behind the drug testing program, thus we cannot conclude that any of the rationales they have presented constitutes a special need justifying departure from the warrant requirement. *See Earls v. Board Of Education,* 242 F.3d 1264 (10th Cir.2001)(*cert. granted* —— U.S. ——, 122 S.Ct. 509, 151 L.Ed.2d 418 (2001))(special needs must rest on demonstrated realities).

Further, because there are issues of material fact that preclude a determination that a special need justifying departure from the warrant requirement exists, we need not proceed to the second part of the special needs test to weigh the competing interests at stake. *See Chandler v. Miller, supra.*

The judgment in favor of defendants is reversed, and the case is remanded to the trial court for further proceedings on plaintiffs' claims.

Judge KAPELKE and Judge VOGT concur.