**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Juan Benet JOHNSON, Defendant–Appellee.**

Nos. 97–2021, 97–2414.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1997.

Decided March 12, 1999.

Melvin K. Washington (argued), Thomas P. Schneider, Office of the Attorney General, Milwaukee, WI, for Plaintiff–Appellant.

David E. Sloan (argued), Waukesha, WI, for Defendant–Appellee.

Before EASTERBROOK, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

When the people of the United States decided to include the Fourth Amendment in the Bill of Rights, they did so for a reason. They wanted to place constraints on the power of the police to conduct searches and seizures based on no more than a general warrant, because they knew that such unchecked power could lead to serious abuses. *Payton v. New York*, 445 U.S. 573, 583, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("[I]ndiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment.") (footnote omitted). See generally Jacob W. Landynski, Search and Seizure and the Supreme Court: A Study in Constitutional Interpretation 19–42 (1966).

Although the Supreme Court has found exceptions to the warrant requirement in a number of compelling situations, it has never deviated from the rule that generalized suspicion alone is not enough to justify a warrantless search of a home, or a seizure of a person incident to such a search. In this case, Juan Johnson convinced the district court that he had been the victim of exactly this kind of prohibited action. It therefore granted Johnson's motion to suppress evidence that the police seized. The United States has appealed under 18 U.S.C. § 3731, and we affirm in part and remand in part for further proceedings. In so doing, we do not in any way underestimate the danger or difficulty of the job of the patrolman on the beat; we hold only that before a police officer targets a particular house and decides to seize literally anyone who might emerge from that house, he or she must either have a warrant or fall within one of the warrant exceptions that the Supreme Court has recognized.

## I

In December 1996, the Milwaukee Police Department (MPD) received a citizen report that drug activity was probably taking place in an apartment building located at 1033 West Atkinson Avenue, in Milwaukee. The information came from a community organization known as MICAH, which apparently is a group that gathers information on possible drug dealings in the area and forwards any information along to the police vice squad. MICAH had been contacted by Philip Aggen, the property manager of 1033 West Atkinson. Aggen identified four particular apartments as trouble spots, including apartment 7.

Detective Mark Mathy, Officer Glenn Bishop, Officer Brian Reilly, and Officer Suzanne Becker, all of the MPD, decided to respond to the complaint using their "knock and talk" technique. As the district court explained, in a "knock and talk," the police approach a house or apartment in which they suspect drug dealing is occurring. They listen outside the door for a brief period of time, and then they knock on the door and attempt to persuade whoever answers to give them permission to enter. If consent is forthcoming, they enter and interview the occupants of the place; if it is not, they try to see from their vantage point at the door whether drug paraphernalia or contraband is in plain view. If it is, then they make a warrantless entry. As this description makes plain, the "knock and talk" procedure typically does not involve the prior issuance of a warrant.

Before the four officers went to the West Atkinson address, they called Aggen and confirmed with him that he had filed the report. At that time, Aggen admitted that he had been told about alleged drug activity, but that he had no personal knowledge of it. Thus, it was plain when the officers decided to check out MICAH's (and Aggen's) complaint (and the state does not argue otherwise) that they could not have obtained a warrant based on the information they then had.

New Year's Eve 1996 was the time the four officers decided to try their "knock and talk" at 1033 West Atkinson. Wearing plain clothes, they went to the building and gained admission from a maintenance worker, Michael Spolowitz. Mathy informed Spolowitz that the MICAH complaint listed apartments 1, 3, 4, and 7 as places where drug dealing might be going on. Spolowitz confirmed that apartment 7 was a busy place and that he believed there could be drug dealing going on there. He also commented that he had observed a lot of people going to apartment 7, leaving quickly, and then departing through the rear building exit.

With this additional information, the foursome walked around to the rear of the building and ascended a rear stairway to the second floor. As they walked up, they heard an upstairs door close at the south end of the building, and they heard footsteps in the hall. Mathy then heard a door slam shut. As they approached apartment 7, Mathy could hear voices inside it, but he could not distinguish what anyone was saying.

In keeping with their "knock and talk" routine, Mathy and Reilly positioned themselves on the right side of the door of No. 7, while Bishop and Becker moved to the left. Reilly stood behind Mathy, and the two listened to the voices inside the apartment. After 15–20 seconds, Mathy prepared to knock. At virtually the same instant, however, a man later identified as Johnson suddenly opened the door. Both Mathy and Johnson were startled to see the other. At that point, Mathy moved to the center of the 36–inch doorway, displayed his badge, and identified himself as a police officer. Johnson, who stands about 5'9" and weighs about 220 pounds, and who was wearing a bulky, black, triple fat goose jacket and blue jeans, stood opposite Mathy in the center of the doorway. Mathy is approximately 5'10" or 5'11" and weighs 185–190 pounds. During this time, Reilly remained behind Mathy, which meant that both Mathy's body and Johnson's body interfered with his view into the apartment.

The surprise encounter at the door set off a scramble inside the apartment, which Mathy observed. Johnson then tried to walk past Mathy out into the hallway, but Mathy stuck out his hand to stop Johnson and directed Reilly to take control of him. In testimony that the district court discredited,

Reilly asserted that at that moment he saw a woman inside the apartment, seated at a table, throw what he believed to be a crack pipe to the floor.

Following his usual practice during a "knock and talk," Reilly prepared to frisk Johnson, even though (as the district court found) Reilly indicated that he did not have reason to believe that Johnson had a weapon. Instead, he relied only on his general knowledge that persons involved in narcotics offenses are often armed and the information furnished in the MICAH complaint. Reilly asked Johnson whether he had a weapon, but Johnson did not respond. While this part of the encounter was occurring, Johnson's hands were visible, away from his body, and Reilly could see that he was not holding anything. Reilly extended his own hands, getting ready for the frisk, and Johnson brought his hands up to Reilly's hands and pushed Reilly's hands outward, mirroring Reilly's gesture. Reilly interpreted this as a sign that Johnson was not going to allow Reilly to pat him down.

In the meantime, Mathy, Bishop, and Becker had walked into apartment 7. Reilly ordered Johnson to go back into the apartment, too, but Johnson refused twice to do so. When Johnson again tried to leave, Reilly grabbed him; Johnson struggled; and Reilly (joined by Mathy and Bishop, who returned to assist Reilly) forced Johnson to the floor. At that point, Bishop felt a gun in Johnson's pocket and retrieved a loaded .38 caliber revolver. The officers then handcuffed Johnson, and after that, he admitted that he also had a loaded .357 magnum in his pocket (which the officers naturally retrieved).

This prompted Reilly to ask Johnson if he had anything else that he should not have had, and Johnson indicated that he did and that it was in his right coat pocket. The forbidden fruit turned out to be a denim bag containing 50 corner-cuts of cocaine base and 27 paper folds of cocaine powder. Later at the police station, Mathy took a statement from Johnson after reading him his *Miranda* rights and obtaining a waiver.

## II

Three days later, on January 3, 1997, a criminal complaint was issued against Johnson charging him with violations of 18 U.S.C. § 922(g) (convicted felon in possession of a firearm), and 21 U.S.C. § 841 (possession with intent to distribute controlled substances). On January 7, 1997, the grand jury returned an indictment charging those offenses, as well as the violation of 18 U.S.C. § 924(c) (possession of a firearm during and in relation to a drug trafficking offense) and § 924(e) (career offender). Johnson pleaded not guilty to all charges the next day.

On January 16, 1997, Johnson filed a motion to suppress the evidence that was seized from him during the police investigation: the two firearms, the cocaine, and his confession at the police station. Magistrate Judge Patricia J. Gorence held a hearing on the motion on February 3, and issued a report and recommendation (R & R) that it be denied on February 14. Johnson filed objections to the R & R on February 21, which the district court took under advisement. In a letter received on March 3, defense counsel advised the court that Johnson planned to change his earlier not guilty plea to a plea of guilty, depending on what the court did with his suppression motion.

The district court held a hearing on the suppression motion on March 3, 1997, at which it heard live testimony from Detective Mathy and Officer Reilly. At the conclusion of the hearing, the court indicated that it planned to grant Johnson's motion to suppress. The minutes of that hearing were entered on the case docket on March 21, 1997, and the court later entered a written decision and order on May 30, 1997. The two docket numbers in this court reflect the fact that the United States filed two notices of appeal, one from the oral decision and the second from the written decision. We consolidated the two appeals, which are essentially one, for all purposes.

## III

### A. *Standard of Review*

In reviewing a district court's decision on a motion to suppress, we review *de*

*novo* the ultimate conclusion that the police did not have reasonable suspicion to stop or search the individual, but we review all findings of historical fact and credibility determinations deferentially, under the clear error standard. The Supreme Court articulated this dual standard of review as follows in *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996):

> ... [A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers. ·

See also *United States v. Duguay*, 93 F.3d 346, 349–50 (7th Cir.1996). Where the inferences drawn from the historical facts by the resident judges and local law enforcement officers are the same, as they generally are when a judge denies a motion to suppress, the reviewing court has no occasion to distinguish between the two. In a case like this one, however, where the district court judge made findings of fact and credibility judgments that conflict with the account proffered by local law enforcement officers, our job is to apply the clearly erroneous standard to the court's findings. Nothing in this situation would justify an appellate court's disregard of the trial court's findings of historical fact, even if the trial court does not find credible the officers' version of events.

### B. *District Court Findings*

 The district court began its analysis of Johnson's motion by describing the two-part test inspired by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). First, the police officer must be justified in his or her initial detention of the individual. In the absence of probable cause for arrest, a police officer may stop and briefly detain a person for investigative purposes, so long as the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), citing *Terry*, 392 U.S. at 30,

88 S.Ct. 1868 (1968); see also *United States v. Vega*, 72 F.3d 507, 515 (7th Cir.1995) ("For an investigatory or *Terry* stop, the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime."). The officer's reasonable suspicion should be based on "the totality of the circumstances—the whole picture." *Sokolow*, 490 U.S. at 8, 109 S.Ct. 1581, citing *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Second, to justify a protective patdown during a *Terry* stop, the officer must be able to point to specific and articulable facts that the individual is armed and presents a risk of harm to the officer or to others. *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; see also *United States v. Rivers*, 121 F.3d 1043, 1045 (7th Cir.1997). The district court further noted that the Supreme Court had reinforced this rule in *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)..

Relying on Officer Reilly's testimony that Johnson was not free to leave after he exited the apartment, the district court first found that the police officers' detention of him was a "seizure" within the ambit of the Fourth Amendment. The court noted that the government did not argue that the police had probable cause to detain Johnson. Nor, it found, did the totality of the circumstances amount to reasonable suspicion of Johnson in particular. The MPD officers had no evidence that he was engaged in criminal activity. Nothing he did immediately after leaving the apartment suggested that he had committed or was committing a crime. The court found that Johnson's refusal to permit Reilly to pat him down could not in itself justify the seizure.

After carefully listening to the officers' testimony and conducting a courtroom reenactment of the encounter at the doorway, where Johnson faced Mathy, and Reilly stood behind Mathy, the court specifically stated that it did "not find credible Officer Reilly's testimony that he saw a woman at the table throwing a crack pipe to the floor of the apartment." Reilly's alleged observation therefore could not provide any basis for the officers' decision to stop Johnson. Similarly,

the court found that the police had no grounds to search Johnson. Reilly had no reason to believe that Johnson was carrying a weapon or any illegal substances at the moment he emerged from the apartment, and Johnson himself took no action to make them fearful for anyone's safety. General information that drug dealing might have been occurring in apartment 7 was not enough to link Johnson to any alleged wrongdoing.

Last, the court found on the basis of the record then before it that Johnson's statements in the apartment building after his seizure and later at the police station were inadmissible. Even though the government had presented evidence tending to show that the statements made at the police station were voluntary, and thus not inadmissible because of a Fifth Amendment violation, the government had to demonstrate that the statements were not tainted by the unconstitutional Fourth Amendment search and seizure. The court acknowledged that not every subsequent statement would be so tainted, but it found that the government had failed at that stage in the proceedings to present evidence regarding the time and totality of the circumstances surrounding Johnson's statements at the police station, and thus it could not show that they were admissible in spite of the Fourth Amendment violation. The District Court therefore granted Johnson's motion to suppress the physical evidence found on his person, as well as his motion to suppress the statements he made during the course of his arrest and at the police station.

### C. *Analysis*

■ In assessing the district court's findings, we must consider the totality of the circumstances. *Sokolow*, 490 U.S. at 8, 109 S.Ct. 1581. One cannot properly understand the Fourth Amendment dimension of Johnson's claim if the story begins with his unexpected emergence from the apartment. Had the police officers been standing outside the door with a warrant in their hands, it may have been reasonable for Fourth Amendment purposes to detain Johnson briefly while they proceeded with their task. Had Johnson

resisted, the police could have taken further measures to assure their own safety and that of those around them. But that is not this case. Instead, nothing but generalized suspicion that the police conceded could not have supported a warrant led them to 1033 West Atkinson. No decision of the Supreme Court, including those we discuss below and those discussed by the dissent, has ever held that police may conduct a *Terry* "frisk" of a house or an apartment—that is, approach it on nothing but a suspicion that something is amiss and conduct a brief warrantless search. The fact that the police had only the vaguest information about the apartment building and apartment 7 is critical to our analysis as a whole, because it reveals that the officers were in essence conducting a general search in the hopes that something would turn up— the very kind of search the Fourth Amendment was designed to regulate.

■ That context colors the first legal question here, which is whether Mathy and his colleagues had reasonable suspicion to stop Johnson and detain him at the moment he emerged from apartment 7. Even if they could not have supported a warrantless search of the apartment, if they had a reasonable belief that Johnson himself was armed and dangerous, that would have supported their efforts to conduct a *Terry* frisk. See also *Knowles v. Iowa*, —— U.S. ——, ——, 119 S.Ct. 484, 488, 142 L.Ed.2d 492 (1998). If they lacked the necessary reasonable and articulable suspicion, then the search incident to this brief seizure that led to the incriminating evidence was unlawful (either in itself or because it was pursuant to an unlawful seizure), unless there is some rule that permits the police to detain and frisk every innocent citizen they encounter. *Terry* and most recently *Knowles* indicate that the law is otherwise, as do the cases we discuss below, and that at a minimum reasonable suspicion about an individual is necessary before that person may be detained by the police.

■ Applying the *Terry* standard, we have consistently held that reasonable suspicion is to be determined in light of the totality of the circumstances. Specifically, the inquiry on appeal must focus on the

events which occurred leading up to the stop or search, and then the trial judge's decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion.

*United States v. Sholola*, 124 F.3d 803, 812 (7th Cir.1997) (citations and quotations omitted). At the same time,

> *Terry* requires only that a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. Of course, the court must keep in mind that a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.

*United States v. Rivers*, 121 F.3d 1043, 1045 (7th Cir.1997) (citations and quotations omitted).

*Ybarra* provides the starting point for our analysis, although we find guidance in *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), and *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). In *Ybarra*, the Supreme Court held that an Illinois statute that authorized law enforcement officers to detain and search any person found on premises being searched *pursuant to a search warrant* violated the Fourth and Fourteenth Amendments, on the facts there presented. The police had obtained a warrant to search a tavern and its bartender for evidence of drug offenses. When the officers arrived at the tavern in question, they announced that they were going to conduct a cursory search of everyone present for weapons. They did so, patting down each of the nine to 13 people present in the tavern, including Ybarra. The patdown of Ybarra revealed a suspicious-feeling package, which an officer retrieved after a second frisk. The package turned out to contain heroin. In due course, Ybarra was charged and convicted of the drug offense, and his case ultimately reached the Supreme Court.

■ The Court began by observing that there was no reason to suppose that the authorities had probable cause to believe that any person at the tavern other than the bartender would be violating the law. Nor had probable cause materialized by the time the police executed the warrant. Moreover, the police had no reason to suspect that Ybarra had committed or was in the process of committing a crime. In language reminiscent of the district court's findings of fact here, the Court pointed out that "Ybarra made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature to the police officers." 444 U.S. at 91, 100 S.Ct. 338. Furthermore, and critically for our purposes, the Court held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search *that person.*" *Id.* (emphasis added). It went on to elaborate further on the importance of individualized focus on the person searched or seized:

> Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons, not places.

*Id.* (citations omitted).

Next, the Court rejected the government's argument that, in the absence of probable cause, the search of Ybarra was proper under *Terry*'s "reasonable suspicion" standard: "The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons." *Id.* at 92–93, 100 S.Ct. 338. The Court cautioned that "[n]othing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons. The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less

than reasonable belief or suspicion *directed at the person to be frisked,* even though that person happens to be on premises where an authorized narcotics search is taking place." *Id.* at 93–94, 100 S.Ct. 338 (emphasis added).

Nothing in subsequent decisions of the Supreme Court has repudiated the requirement for individualized suspicion for either a *Terry* stop or a full-blown search in the circumstances presented here. Even if we were to agree with the dissent that the Court has identified a number of specific situations in which the police can act on general suspicion without a warrant, a closer examination of the facts of the relevant cases shows that they cannot be extended to cover Johnson's detention and search. In *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Court held that the police may conduct a "protective sweep," defined as a "cursory visual inspection of those places in which a person might be hiding," *id.* at 327, 110 S.Ct. 1093, in conjunction with an in-home arrest supported by a warrant. Here, of course, in attempting to detain Johnson the police did far more than conduct a "cursory visual inspection" of his person. Most important, the protective sweep described in *Buie* is conducted pursuant to an arrest for which there was a warrant. The police had properly established probable cause with respect to the targeted individual and the area he occupied. That critical fact is missing here, as there was no warrant to search apartment 7. These are not unimportant limitations on the *Buie* rule; at the very least, it would be a significant expansion of *Buie* to hold that it applies to a seizure and subsequent search of a person for whom there is no arrest warrant, at the threshold of a dwelling for which there is no search warrant.

Also distinguishable are *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), and *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 885–86, 137 L.Ed.2d 41 (1997). *Mimms* held that the police may order the driver out of her car after a lawful vehicle stop, even in the absence of reasonable suspicion that the driver is armed. Just as a *Buie* protective sweep accompanies a lawful arrest, the *Mimms* re-moval of a driver from her car is conducted pursuant to a lawful stop. As the Supreme Court explained, coming on top of the vehicle stop, this invasion is "de minimis." *Mimms,* 434 U.S. at 111, 98 S.Ct. 330. Moreover, the minimal intrusion is a justifiable protective measure, given the special risk that accompanies an officer approaching a person seated in an automobile. *Id.* at 110, 98 S.Ct. 330. *Wilson* adds little to the analysis; it extends the *Mimms* rule to allow the removal of a passenger from a lawfully stopped vehicle because of the dangers to officers inherent in a (valid) traffic stop coupled with the minimal additional intrusion to the passenger's privacy. More analogous to our case is the Supreme Court's recent pronouncement in *Knowles,* where the Court refused to extend the auto search cases to a situation in which an officer who issued a traffic citation conducted a full search of the person's car. 119 S.Ct. at 486. The Court in *Knowles* held that even though officers have a legitimate concern for their own safety when they make traffic stops, this concern did not justify their tactics. *Id.* at 488. The *Knowles* holding is particularly telling because it involved a car, which is entitled to less Fourth Amendment protection than a home, because of the different privacy concerns that apply to each. See *California v. Carney,* 471 U.S. 386, 393, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) (explaining that there is a "reduced expectation of privacy" in motor vehicles because they are "subject to a range of police regulation inapplicable to a fixed dwelling"). It would be incompatible with the thrust of *Knowles* to find that random seizures outside of homes are permissible, when searches incident to traffic stops are not.

*Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), also offers no support for Johnson's initial detention. In *Summers,* the Detroit police obtained a warrant to search a house for narcotics. Just as they arrived, they encountered Summers descending the front steps. In an action the Court frankly acknowledged was a "seizure" within the meaning of the Fourth Amendment, *id.* at 696, 101 S.Ct. 2587, the police detained Summers and forced him to re-enter the house while they conducted their search. That seizure was constitutional, the

Court confirmed, only if it met the Fourth Amendment's general reasonableness requirement. At that point in the opinion, however, the factual circumstances in *Summers* depart significantly from those before us today:

> Of prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband. A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there. The detention of one of the residents while the premises were being searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself.

*Id.* at 701, 101 S.Ct. 2587. Although the Court also noted that detention served three legitimate law enforcement interests—preventing flight in the event incriminating evidence was found, minimizing the risk of harm to the officers and the occupants, and facilitating the orderly completion of the search—it returned again and again in its discussion to the central fact that the search of Summers' home was pursuant to a warrant. See, *e.g., id.* at 705, 101 S.Ct. 2587 ("We hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain occupants of the premises while a proper search is conducted."). That warrant provided objective justification for the temporary detention of Summers; after finding drugs in the house and determining that Summers was the owner, the police had probable cause to arrest and search Summers himself.

The same circumstances applied in this court's decision in *United States v. Pace*, 898 F.2d 1218 (7th Cir.1990), in which we applied *Summers* to a detention of two individuals inside a condominium the police were searching pursuant to a warrant, even though the individuals in *Pace* were neither occupants nor residents of the unit. As in *Summers*, we held that "it is still significant that [the two individuals] were present in a condominium that a neutral magistrate had found probable cause to believe contained evidence of illegal gambling activities." *Id.* at 1239. The court distinguished *Ybarra* principally on the ground that the two men were present in a place that had large amounts of cocaine and money lying in the open—a circumstance that added considerably to the "mere propinquity to others independently suspected of criminal activity ... without more" that the *Ybarra* Court had found insufficient. In so holding, the court acknowledged that "*Ybarra* may not apply only to public places," but it found it unnecessary to explore that question further. *Id.* at 1240. See also *United States v. Reid*, 997 F.2d 1576 (D.C.Cir.1993) (search of person emerging from private residence permissible, again when police had a search warrant for the apartment).

We do not suggest that a search or seizure is never permissible in the absence of particularized suspicion. The Supreme Court has, under carefully defined circumstances, upheld a variety of suspicionless (and warrantless) searches and seizures conducted as part of regulatory schemes. In these cases, however, the standards are different from those applied to searches and seizures conducted in the course of criminal investigations. See, *e.g., Vernonia School District 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (permitting random urinalysis drug testing for student athletes at a public high school); *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (allowing police to stop all vehicles passing through sobriety checkpoints and examine their drivers for signs of intoxication); *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (allowing border officials to stop vehicles at fixed checkpoints to enable questioning of the occupants about their citizenship and immigration status even though there is no reason to believe the particular vehicle contains illegal aliens). For example, in *Acton*, the Court explained that the suspicionless search was permissible because the school stood *in loco parentis* to the children involved, the intrusion was comparable to other requirements such as mandatory physical examinations and vaccinations, and the student athletes had volunteered to participate in team sports and thereby subjected themselves to a high degree of regulation.

See *Acton,* 515 U.S. at 654–58, 115 S.Ct. 2386. Nothing like these considerations applies in the case before us. *Sitz* and *Martinez-Fuerte* focused on the facts that the checkpoints were selected pursuant to established guidelines, reducing the officers' discretion, and that the checkpoints did not take motorists by surprise, limiting the fear that the intrusion was likely to induce. See *Sitz,* 496 U.S. at 452–53, 110 S.Ct. 2481; *Martinez-Fuerte,* 428 U.S. at 559, 96 S.Ct. 3074.

More significant, regulatory searches and seizures are not driven by a desire to protect from harm the particular law enforcement officials undertaking the search or seizure. The Supreme Court has addressed the substantial weight that courts should give the safety of police officers undertaking criminal investigations in cases such as *Terry, Buie, Wilson,* and, most recently, *Knowles.* As these cases make clear, while officer safety is "both legitimate and weighty," *Knowles,* 119 S.Ct. at 487 (citation omitted), it cannot in all circumstances justify a search or seizure. See *id.* at 487–88. This must be the case, or otherwise nearly any invasion of a person's privacy could be justified by arguing that the police needed to protect themselves from harm. We believe that when a person about whom the police do not have reasonable suspicion to believe is armed and dangerous exits a dwelling for which the police do not have probable cause to search, any risk of danger to law enforcement does not justify the intrusion attending police detention. Furthermore, we are confident that if the Court had thought that it was overruling *Ybarra's* individualized suspicion requirement in *Buie, Wilson, Acton,* or any of the Court's other pronouncements on the subject, it would have said so. Since it did nothing of the kind, we must and do continue to apply the *Ybarra* standard. See, *e.g., United States v. Rivers,* 121 F.3d 1043, 1045 (7th Cir.1997); *United States v. Chaidez,* 919 F.2d 1193, 1200 (7th Cir.1990) (observing that *Ybarra* does not forbid the use of probabilistic evidence, but also finding that more than "mere propinquity" supported the detention there).

The dissent dismisses the differences we have pointed out between the Supreme Court decisions that have allowed certain kinds of searches and seizures, and our own case. Instead, invoking the weighty and emotionally charged concern of the risk of life or death for the police officer, it stitches together bits and pieces of these decisions and concludes that the police are entitled to detain any individual whatsoever who emerges from any dwelling, even though they have not collected enough evidence to support a warrant for that person's arrest or a search of the building, and even though none of the other exigent circumstances supporting a search or seizure is present. With respect, we believe that the conclusion the dissent draws cuts away the core of the Fourth Amendment's protections, in a way the Supreme Court has never sanctioned, and in a way that is incompatible with the Court's latest pronouncements on the subject. Under the dissent's logic, no matter who walked out the door of apartment 7 that New Year's Eve—a pizza delivery person, an elderly grandmother, a six-year old child, or Juan Johnson—the police were entitled to detain that individual for some unspecified period of time. If they could have shown to a magistrate's satisfaction that there was probable cause to believe illegal activity was occurring there, then under *Summers* they may have been well within their rights to take this action. But, we repeat, they admit that they could not. This may mean that the police use a tactic like "knock and talk" somewhat less frequently, but that may be the price of compliance with the Fourth Amendment.

Taking together the district court's findings of historical fact, which, based as they are on a combination of credibility findings and the court's own assessment of the evidence, we cannot find to be clearly erroneous, and the pertinent Supreme Court authority, we find no reversible error in the district court's decision to grant Johnson's motion to suppress. We have already noted that the police did not have a warrant either for the apartment building as a whole or any of its units, and thus their actions were not protected by *Summers* and *Pace.* Equally important, none of the other exceptions to the requirement of a warrant before a private dwelling may be searched applied here. The police were not confronted with a readily

moveable automobile, which the Supreme Court has recognized calls for more relaxed standards for the police. See *Carney,* 471 U.S. at 392–93, 105 S.Ct. 2066; *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The police were not in hot pursuit of a suspect, facing imminent destruction of evidence, or otherwise confronted with circumstances sufficiently grave to justify a warrantless intrusion. See *Welsh v. Wisconsin,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). The stop and search of Johnson was not a limited invasion of his privacy, undertaken as a precautionary measure by the police *subsequent* to independent events for which there was probable cause to suspect criminal activity and present danger. See *Mimms,* 434 U.S. at 110 n. 5, 111, 98 S.Ct. 330; see also *Buie,* 494 U.S. at 326, 334–35, 110 S.Ct. 1093. There were no exigent circumstances that required the police to burst into the apartment, as the footsteps and door closings the police heard carried no hint of urgency (and it was, after all, New Year's Eve, a time when people are often out and about). No one had consented to a police entry; and nothing suspicious was in plain view. As we have discussed above, although the Supreme Court has held that a risk of danger to law enforcement may under certain circumstances justify a search or seizure, such a risk is not always enough. See *Knowles,* 119 S.Ct. at 488.

The lack of a warrant takes this case out of the class of warrantless seizures incident to a search pursuant to a warrant—essentially the *Summers* group. Instead, without even the warrant that supported the police entry in *Ybarra,* the officers stood in the public hallway outside apartment 7, expecting that they would knock on the door and try to persuade the occupants to allow them to enter. The public nature of the place where they stood may indicate that this case is very close indeed to *Ybarra,* which also involved searches of people in a public place. Although it happened to be Johnson who walked out the door, as we noted above it could have been anyone. On the other hand, Johnson identified himself with apartment 7 when he emerged, and from that standpoint

he was less a member of the general public than the tavern patrons in *Ybarra.* We see no need here to decide definitively whether *Ybarra*'s requirement of more than "mere propinquity to others independently suspected of criminal activity" should be extended to purely private places. Here, the police had only a suspicion about the apartment as a whole; they had no idea whether anyone then in the apartment was dealing drugs or not, and thus there was no one "independently suspected" of criminal activity for whom we could apply the "mere propinquity" rule.

All three judges on this panel are keenly aware of the reality that the police often know in general terms of places where drug dealing occurs: sections of a city, run-down apartment complexes, street corners, and the like. No one disputes that drugs are a scourge on society, especially on the lives of those who live in the midst of the dangerous drug culture. This is the concern that has led authorities to try to devise methods consistent with the Fourth Amendment to "sweep" through public housing projects in order to gain the upper hand on this serious problem. See generally Zionne N. Pressley, *Privacy or Safety: A Constitutional Analysis of Public Housing Sweep Searches,* 6 B.U. Pub. Int. L.J. 777 (1997); Corey Roush, *Warrantless Public Housing Searches: Individual Violations or Community Solutions,* 34 Am.Crim. L.Rev. 261 (1996); Charles Hellman, *Secure in Their Houses? Fourth Amendment Rights at Public Housing Projects,* 40 N.Y.L. Sch. L.Rev. 189 (1995). One district court in this circuit enjoined this type of sweep at facilities operated by the Chicago Housing Authority, in *Pratt v. Chicago Housing Authority,* 848 F.Supp. 792 (N.D.Ill. 1994); by agreement of the CHA, no appeal was taken from the permanent injunction the court entered. The responses to both *Pratt* and the debate the case engendered have focused on advance consents or waivers signed by public housing residents who would like to improve their own security. We offer no opinion here on whether such consents or waivers are either necessary or sufficient for Fourth Amendment purposes. It is enough for present purposes to note that no court has yet held that the police may

search any apartment in a public housing project whenever they want, without a warrant, simply because they believe that drugs may plague that particular project. Although the government suggests that the generalized tips the police received about 1033 West Atkinson might have been enough to support reasonable suspicion of virtually anyone emerging from (or within) any of the targeted apartments, in our view this position is inconsistent with the standards established in *Terry, Ybarra,* and *Summers.*

We do not hold today that the "knock and talk" technique is automatically unconstitutional. Nevertheless, just as in *Knowles,* the police themselves must recognize the inherent limits in this more informal way of proceeding. Without reasonable suspicion, they cannot detain a person just because that individual walks out of an apartment on New Year's Eve, even if some unspecified individual (whose reliability is utterly untested, *cf. Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)) thinks something fishy is sometimes going on there. The district court's findings of historical fact here confirm that nothing more than this supported their detention of Johnson that evening.

## IV

■ Last, we address the district court's conclusion that the government failed to meet its burden of proof to show that Johnson's post-seizure statements, both in the apartment building and at the police station, were not tainted by the initial violation of his Fourth Amendment rights. We understand this to be the district court's ruling on the state of the record as it then had been developed. At that point, the government was relying solely on the Fifth Amendment voluntariness argument and was not attempting to show dissipation of the taint for Fourth Amendment purposes. It presented no evidence at the March 3, 1997, hearing on Johnson's motion to suppress that would have shown that any taint from the improper stop and frisk had dissipated. That hearing concluded with the district court's decision to exclude all evidence—including Johnson's statement at the police station, as tainted

fruit—and a request to the parties for proposed findings of fact and conclusions of law.

On March 18, the government responded to Johnson's proposed findings with a request the government now be allowed to present testimony about what happened between the detention and the statement taken at the station, to show that the latter statement was untainted. The government explained its prior silence on this issue as based on Johnson's concession that the statement was voluntary. In response, Judge Clevert scheduled a May 19 hearing on the admissibility of the police station statement. The government itself, however, truncated those proceedings by filing its notice of appeal from the March 3 oral ruling (entered on March 21) on April 21, 1997. Although the government filed a statement of legal authorities on May 16 to support its argument that the taint had dissipated, the May 19 hearing was devoted primarily to the question whether the district court still had jurisdiction over the case in light of the April 21 notice of appeal. The government did not withdraw its notice of appeal and the district court decided that it no longer had jurisdiction over the case. Accordingly, the district court issued a written decision based on its prior oral decision, without taking further testimony on dissipation of the taint.

Under the circumstances, we regard the question whether the government should be entitled to proceed on remand with evidence about dissipation of the taint as one better considered in the first instance by the district judge. One of the inevitable consequences of interlocutory orders is that further proceedings in the case after the interlocutory appeal may alter the ultimate outcome. This is particularly true for appeals under 18 U.S.C. § 3731, which do not, like appeals under 28 U.S.C. § 1292(b), require a finding that the appeal presents a controlling question of law.

The orders of the district court suppressing the evidence in Johnson's case are AF-FIRMED for the reasons stated in this opinion, on the understanding that further proceedings may take place on the admissibility of the post-seizure statements. Accordingly, the case is REMANDED to the district court.

TERENCE T. EVANS, Circuit Judge, concurring.

This is a very close case, and that's a testimonial both to Judge Easterbrook's powerful dissent and the steady erosion of the Fourth Amendment occasioned by the government's war on drugs. Ultimately, I come down on Judge Wood's side of the case. I write separately to note why I think her position is correct.

The dissent says "Milwaukee's 'knock and talk' process is a distraction." That statement is true, however, only if the focus of this case is solely on the exact moment the officer stopped Johnson and started to frisk him. But there is a broader context, and it is there that Judge Wood is right. The police had no warrant when they went to apartment 7. They were taking a shortcut in the hope that something good (from a drug-busting perspective) would turn up. A little more work would have given the police the probable cause they needed to secure a warrant, but they didn't want to take the time to do something more. They wanted to go directly to apartment 7 and see what, if anything, was up.

When a shortcut is taken and a dangerous situation arises, police will (and should) always search first and let the lawyers worry about the legalities later. They will (and should) always do what is necessary to protect themselves. But to understand precautions—here, the desire to frisk Johnson—is not to say the precautions are consistent with the Fourth Amendment. If the police use a shortcut and a need to protect themselves arises, they run the risk of not being able to use, in court, evidence they stumble on. No one would suggest that once an emergency is created the police should stand still and risk being shot. But our case today really presents a question about where the proper analysis of this search begins, and in my view it doesn't start just as the door to apartment 7 was opened.

As I see it, the seeds of this bad search were sown when the police decided to use the "knock and talk" technique. And that process—which sounds more like a friendly visit to sell tickets to a police picnic than a perilous visit to a suspected drug hive—is fraught with danger, not to mention constitutional problems. And I think a fair reading of this record compels the conclusion that the police knew they were on thin legal ice when they decided to go to the door to apartment 7 for their "knock and talk." That's why, I suspect, they tried to gussy up their case (i.e., inject it with probable cause) through Officer Reilly's claim that as soon as the door opened he saw a woman in the apartment toss a crack pipe to the floor. The experienced district judge, after hearing this claim and conducting a courtroom reenactment, found the claim to be "incredible." In less sugar-coated terms, the judge found that the officer lied. The seizure and search of Johnson, as Judge Wood persuasively shows, was not consistent with what little is left of Fourth Amendment jurisprudence.

EASTERBROOK, Circuit Judge, dissenting.

Milwaukee's "knock and talk" process is a distraction. What the police planned or tried to do at Apartment 7 is irrelevant; only what they *did* matters. *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). What they did was approach a suspected crime den—as they were entitled to do, whether or not they had probable cause, see *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *United States v. James*, 40 F.3d 850, 856 (7th Cir. 1994)—and ask a single person to stand still for a brief time until they determined whether the situation was hazardous. My colleagues hold that police must let someone like Johnson go without knowing whether he is armed, even though within moments he may wheel and fire. Reason to believe that persons situated similarly to the subject commonly carry guns—a proposition true about drug distribution points—is inadequate, the majority concludes. The evidence cannot be systemic; it must be particularistic. The distinction between systemic and particularistic evidence is elusive; ex ante *all* suspicion is based on categorical inferences (for example, that bulges in clothing are associated with guns). So to say that X was found in a crack house, and that many denizens of such places are armed, is to know a great deal

about X, more than the police knew in *Terry*. Let that pass. The point is that the fourth amendment permits reasonable searches and seizures. A stop is reasonable when the subject is in the company of people who often go armed.

Like the majority, I accept the district judge's finding that the police did not see a crack pipe inside Apartment 7. They knew some things about that apartment without seeing inside, however, and could infer more. The landlord suspected that it had become a drug distribution point; a maintenance worker at the building "had observed a lot of people going to apartment 7, leaving quickly, and then departing through the rear building exit." 170 F.3d 708, 711. These observations imply a retail business of some kind, and the lack of signs announcing the nature of the establishment (plus the fact that the business was in a residential building) meant that the operation almost certainly was unlawful. People do not "quickly" leave New Year's Eve parties by the back stairs, and the maintenance worker's report of heavy traffic was not limited to the day the officers arrived. Which law the occupants were breaking could not be known without inspection: perhaps they were selling stolen merchandise, pirate videotapes, or bogus "Rolex" watches; quick departures are not consistent with an unlicensed bar; but the activity was consistent with drug distribution, just as the owner suspected. And when the police arrived they heard enough voices from inside to suggest that their hands would be full if the occupants turned out to be hostile. What the officers had was more than a stray report; they had a reasonable suspicion of ongoing crime.

This was the setting from which Johnson emerged, before the officers knocked on the door. Johnson, obviously not a pizza delivery boy or other innocuous type, attempted to walk past the officers; meanwhile sounds within the apartment conveyed a sense of panic once the officers announced their identity. Johnson was wearing bulky clothes that made it easy to conceal weapons. Officer Reilly asked Johnson whether he was armed; Johnson remained mum. Reilly asked Johnson to step back into the apartment; Johnson refused and tried to leave, flailing his arms to break Reilly's hold on his sleeve. It took three officers to wrestle Johnson to the ground, and in the process Officer Bishop felt a gun. This turned out to be a loaded .357 Magnum. Johnson also was carrying cocaine packaged for retail distribution, plus a second handgun.

My colleagues approach the case as if the question were whether the police had enough suspicion to conduct a *Terry* frisk. Posing the question in this way ordains the answer, because *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), holds that the police may pat down a person for weapons only if they have some suspicion in addition to the person's presence at the scene of a crime. See also *Maryland v. Buie*, 494 U.S. 325, 334–35 n. 2, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); *Michigan v. Summers*, 452 U.S. 692, 695 n. 4, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *United States v. Evans*, 994 F.2d 317, 322 (7th Cir.1993). But it is the wrong question. The police did not frisk Johnson until *after* feeling a weapon in his pocket during the struggle to prevent his departure. Perhaps they wanted to frisk him earlier (one officer held out his hands to initiate the process), but they did not do so. The right question therefore is whether the police were entitled to insist that Johnson return to the apartment (or remain in sight in the hall) until the nature of the business being conducted, and the risk the occupants posed, had been ascertained. If the police were entitled to detain Johnson for these few minutes, then his attempt to escape and the discovery of one gun was all the cause needed for everything that ensued. *United States v. Sharpe*, 470 U.S. 675, 682–83 n. 3, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *United States v. Quinn*, 83 F.3d 917, 921–22 (7th Cir.1996); *United States v. Weaver*, 8 F.3d 1240, 1244 (7th Cir.1993); *Tom v. Voida*, 963 F.2d 952, 957–58 & n. 4 (7th Cir.1992); *United States v. Chaidez*, 919 F.2d 1193, 1200 (7th Cir. 1990); *United States v. Brown*, 159 F.3d 147 (3d Cir.1998). See also *Michigan v. Chesternut*, 486 U.S. 567, 576, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (Kennedy, J., concurring) ("respondent's unprovoked flight gave the police ample cause to stop him.").

Two years after *Ybarra,* the Supreme Court decided that the requirement of person-specific information required for a *search* (including a pat-down search) did not apply to a *seizure,* and in particular to a demand that persons remain at the scene of an investigation. Police about to execute a search warrant encountered someone on the front steps of the house to be searched. They did not know whether this person was dangerous and had no reason to suspect that he was carrying a gun but insisted that he stay put while the search was conducted. The Court held in *Michigan v. Summers* that such a seizure is proper because of the *risk* that similarly-situated persons will interfere with the search (or induce someone else to do so) if free to leave, and in the process distinguished between detention and detention-plus-frisk:

> The "seizure" issue in this case should not be confused with the "search" issue presented in *Ybarra* v. *Illinois,* 444 U.S. 85. In *Ybarra* the police executing a search warrant for a public tavern detained and searched all of the customers who happened to be present. No question concerning the legitimacy of the detention was raised. Rather, the Court concluded that the search of Ybarra was invalid because the police had no reason to believe he had any special connection with the premises, and the police had no other basis for suspecting that he was armed or in possession of contraband. See *id.,* at 90–93. In this case, only the detention is at issue. The police knew respondent lived in the house, and they did not search him until after they had probable cause to arrest and had done so.

452 U.S. at 695–96 n. 4, 101 S.Ct. 2587. In other words, a brief detention may be justified by circumstances unrelated to the apparent danger posed by the person detained; a search of that person requires additional justification. That ought to be the end of our case. The police detained Johnson (or tried to) but did not frisk him until his defiance of their instructions produced ample cause—the discovery of a weapon.

According to my colleagues, *Summers* is not dispositive because the police arrived at the house in Michigan with a search warrant, while the police arrived at the apartment in Illinois with only a suspicion that crime was afoot. That is a factual difference, to be sure, and one the Supreme Court mentioned, but does it justify a legal difference? A point of *Summers,* and other cases too, is that less is required to support a short detention than to support a search, and that one good justification for such a limited intrusion is risk: "Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." 452 U.S. at 702, 101 S.Ct. 2587 (footnote omitted). Just so here, one would think. Whether to confine *Summers* to the execution of search warrants (as the majority does) or recognize the broader principle that risks during drug investigations justify precautionary stops depends on how well that latter approach fits with other parts of fourth amendment jurisprudence—and with the world at large.

Many cases in addition to *Summers* say that a particular search or seizure may be deemed reasonable because of risks that do not point a finger of suspicion at a particular person. Consider a few examples:

- After stopping a vehicle for a traffic infraction, the police may insist that the driver get out of the car, and that the passenger remain seated (or get out). The rationale for this seizure of both driver and passenger is the riskiness to officers of traffic stops. *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).
- After making a custodial arrest, the police may conduct a complete search of the person, including the contents of any packages he may be carrying, to ensure that none of the items is dangerous. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Cf. *Knowles v. Iowa,* —— U.S. ——, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998).

- Police may set roadblocks and stop all cars in order to check drivers' licenses, insurance, intoxication, and other factors that affect the risk posed to motorists. *Michigan Department of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). Cf. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

- After entering a dwelling to make an arrest, police may conduct a visual "protective sweep" of other rooms to ensure that armed occupants there do not pose a risk. *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

- School officials may conduct random urinalysis checks of junior high school athletes in light of the hazards drug use poses on the field. *Vernonia School District 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); see also *Dimeo v. Griffin,* 943 F.2d 679, 682–83 (7th Cir.1991) (en banc) (fourth amendment permits drug tests of jockeys and other horse race participants in light of the sport's dangerousness).

The list could be extended (think of airport searches for weapons and explosives), and it has parallels in other parts of the law. For example, police may ask a suspect whether he has any weapons before administering *Miranda* warnings, in order to curtail the risk that firearms pose. *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

Doubtless each of these situations differs in some respect from our case. *Mimms, Wilson,* and *Sitz* involve cars; *Robinson* and *Buie* involve arrests; *Acton* involves youngsters; *Dimeo* involves horses; and so on. To my colleagues these differences show that the cases are irrelevant; to me these many differences show the scope of the principle that situational risks justify minimal law-enforcement demands, such as the stay-where-you-are-for-a-few-minutes order issued to Johnson. *Knowles* makes this very point when holding that persons in a car stopped for a traffic violation may not be subject to the same full search appropriate to a custodial arrest. As the Court observed in *Knowles,* the demands made in *Mimms* and *Wilson,* such as "get out of the car" or "remain where you are while we write a ticket" are modest compared with a full search, and accordingly justifiable if the officers face a modest danger. See also *United States v. Sakyi,* 160 F.3d 164 (4th Cir.1998) (circumstances making a traffic stop out of the ordinary justify a frisk as well as an order to get out of the car). Likewise the demand made of Johnson called for very little of his time, and the danger to the officers justifying the imposition was appreciable. See *United States v. Place,* 462 U.S. 696, 709–10 & n. 10, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (implying the propriety of stops that do not exceed 20 minutes, although eschewing a "rigid" time limit); ALI, *Model Code of Pre–Arraignment Procedure* § 110.2(1) (1975).

How hazardous must a police-citizen encounter be to justify an order to stand still (or get out of a car)? In *Wilson* the Supreme Court told us that it thought the risks of traffic stops sufficient because during 1994 officers suffered 5,762 assaults and 11 deaths during traffic pursuits or stops. 519 U.S. at 413, 117 S.Ct. 882, citing Federal Bureau of Investigation, *Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted* 71, 33 (1994). The risk per stop was quite modest, given the large number of traffic stops in the whole United States over the course of a year—and the fact that some of the fatalities reported by the FBI surely came from high-speed traffic pursuits, rather than stops. (Data in Steven G. Brandl, *In the Line of Duty: A Descriptive Analysis of Police Assaults and Accidents,* 24 J.Crim. Justice 255 (1996), imply that two-thirds of the injuries in traffic cases are attributable to chases.) In 1997, the most recent year for which data are available, 7 officers died in traffic pursuits or stops, and 9 died while "investigating suspicious persons/circumstances", the category that seems closest to the investigation of Apartment 7. Federal Bureau of Investigation, *Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted* 29 (Table 15) (1998). During a 10-year period, 89 officers died as a result of traffic stops or pursuits, and 128 died during investigations. Another 250 died while making arrests (45 of these in the subcategory of

drug-related arrests). There are far fewer drug arrests (or investigations) than traffic stops, so the risk to officers during drug investigations seems appreciably greater. Accord, Allen P. Bristow, *Police Officer Shootings—A Tactical Evaluation*, 54 J.Crim. L., Criminology & Police Sci. 93 (1963) (finding that suspects approached in buildings are substantially more dangerous to police than are suspects approached in cars). As for injuries: in 1997 traffic pursuits and stops produced 5,043, "investigating suspicious persons/circumstances" led to 5,446, and arrests (other than robbery or burglary) were associated with 8,373 injuries. *Law Enforcement Officers Killed and Assaulted* at 75 (Table 29). Detective Mathy, who led the team to Apartment 7, was wearing body armor; perhaps he had seen these tables.

Drugs and guns go together, and armed persons are tempted to use their weapons. Asking Johnson to stand still (or reenter the apartment) was a prudent precaution. Judge Evans writes that in a situation such as this police "will (and should) always do what is necessary to protect themselves." 170 F.3d at 721. From this, and the fact that it was lawful to approach Apartment 7 in the first place, it follows that the demand made of Johnson was a "reasonable" seizure within the meaning of the fourth amendment. Judge Evans appeals to the principle that police who needlessly create danger can't invoke exigent circumstances to justify what follows, but walking through the public spaces of an apartment house to see whether the occupants of an apartment are willing to talk can't be put in that category—not without discarding the principle that the police don't need "probable" (or any) cause to knock on a door and ask for cooperation. The police did not create the hazard; they just approached it and were entitled to protect themselves. What made this seizure reasonable was knowledge about the risks associated with the activity, not knowledge about Johnson personally. Officers must be entitled to act on systemic information. Time and again the Supreme Court holds that they may; that principle is no less appli-

cable to drug investigations. Any cop on the beat who thinks that information about a person's location and associates cannot justify a stop would be wrong. Dead wrong.