24CA1162 2800 v Residences 09-04-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1162
City and County of Denver District Court No. 23CV31396
Honorable David H. Goldberg, Judge

---

2800 E. 2nd Avenue #304, a Colorado limited liability company,

Plaintiff-Appellant,

v.

The Residences at Northcreek Association, a Colorado nonprofit corporation,

Defendant-Appellee.

---

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE SCHUTZ
Fox and Harris, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 4, 2025

---

Sweetbaum Miller PC, Alan D. Sweetbaum, Andrew S. Miller, Ryan Hull, Denver, Colorado, for Plaintiff-Appellant

Hall & Evans, LLC, Valerie Garcia, Heather A. Thomas, Denver, Colorado, for Defendant-Appellee

¶ 1    This appeal arises from a dispute between 2800 E. 2nd Avenue #304, LLC (Owner) and The Residences at Northcreek Association (the Association) over a proposed project to enclose an outdoor rooftop patio.  The Association approved the proposed improvements subject to conditions.  Owner filed suit challenging the conditions.

¶ 2    Owner moved for summary judgment, and the Association moved for the determination of a question of law central to the case.  The court denied Owner's motion, granted the Association's motion, and entered judgment in the Association's favor on all claims.  Owner appeals.  We affirm and remand with directions.

I.    Background

¶ 3    The Residences at Northcreek (Residences) is a luxury condominium development located in the Cherry Creek North area of Denver.  The Residences was formed in 2007 as a common interest ownership community and is subject to a "Declaration of Covenants, Conditions and Restrictions" and the "Master Declarations of Covenants, Conditions and Restrictions for Northcreek" (collectively, the Declaration).  The Residences' formative documents also include a condominium map, which

describes and illustrates its units, common elements, and limited common elements. The condominium map also identifies the "location . . . of the horizontal boundaries of each unit" and "[t]he approximate location and dimensions of limited common elements, including porches, balconies, and patios." § 38-33.3-209(2)(g), (2)(j), C.R.S. 2025 (describing the map requirements for a common interest ownership community).

¶ 4    The Residences is subject to the Colorado Common Interest Ownership Act (CCIOA). *See* §§ 38-33.3-101 to -401, C.R.S 2025. The Association is responsible for the management of the Residences. Proposed improvements at the Residences must be approved by the Association's Design Review Board.

¶ 5    In 2021, Owner purchased Unit 304, which is located on the top floor of the Residences and includes an enclosed elevator and stairway (shared with Unit 303) that provides access to the Association's enclosed mechanical closet and two unenclosed rooftop patios, one for Unit 303 and the other for Unit 304. The following are floorplans of the third floor (left image) and rooftop (right image) from the condominium map setting forth the

horizontal and vertical boundaries of Unit 304, the limited common

elements, and some general common elements:



¶ 6     The rooftop patio above Unit 304 is a limited common element

for Unit 304's exclusive use, subject to an easement in favor of the

Association to access the entirety of the rooftop for repair and

maintenance of the mechanical and utility elements located there.

¶ 7     On August 10, 2022, Owner applied to make improvements to

the rooftop patio.  Specially, Owner sought approval to build out

and enclose most of the rooftop patio with exterior walls and a roof

and interior finishes that included an office, library, kitchenette,

and bathroom.  The estimated cost of the proposed improvements

was $4.4 million. In the application, Owner did not expressly seek to alter the boundaries of Unit 304. To the contrary, Owner argued that the proposed improvements did not change the boundaries of Unit 304 in any manner and that the enclosed portion of the rooftop patio would remain a limited common element for Owner's exclusive use subject only to the Association's utility easement.

¶ 8    Two weeks after submitting the application, Owner contacted the Association to follow up on its status. The Association informed Owner that it had sent the application to the Design Review Board for further consideration. Over the following months, the Design Review Board evaluated the application and requested additional information to assist in its review, which Owner provided.

¶ 9    In March 2023, after several communications and exchanges of information with Owner, the Design Review Board conditionally approved the application. The conditional approval required the Owner to obtain a conveyance from the Association of the limited common element and approval of the transfer from 67% of the Association's members and 50% of the entities holding first mortgages on all units in accordance with section 17.3(c) of the Declaration (requiring consent from 50% of the first mortgagees to

4

any change in a unit boundary) and section 38-33.3-312(1), C.R.S. 2025 (requiring consent from 67% of unit owners for the Association's transfer of common elements).

¶ 10    Owner objected to the approval conditions, and when the dispute could not be resolved, it initiated this lawsuit.  Owner brought claims against the Association for declaratory relief, breach of contract, and breach of the Declaration's implied covenant of good faith and fair dealing.  Owner requested the court to find that (1) the application must be "deemed approved" because the Design Review Board did not approve or deny the application within thirty days from its submittal; (2) the Association had waived any right to treat the proposed improvements as a change in the boundaries of Unit 304 and the limited common element; and (3) the proposed addition did not modify the boundaries of Unit 304 or necessitate a transfer of the limited common element.

¶ 11    Owner filed a motion for partial summary judgment, and the Association filed a motion for the determination of a question of law regarding whether the proposed improvements would change the boundaries of Unit 304, thereby triggering the voting conditions

imposed by the Association. The district court granted the Association's motion and denied Owner's motion.

¶ 12 As relevant on appeal, the court rejected Owner's argument that the Association had implicitly approved the application by failing to take definitive action within thirty days. The court also concluded that Owner's contemplated enclosure of the rooftop patio, and associated improvements, converted the rooftop patio from a limited common element for the exclusive use of Unit 304 into part of Unit 304. The court also decided that the changes to Unit 304's boundaries required a conveyance of the limited common element to Owner from the Association; such a conveyance, in turn, required approval by 67% of the other unit owners and 50% of the first mortgagees. Alternatively, the court concluded that, even if the improvements did not effectuate a change in the boundaries of Unit 304 or the ownership of the limited common element, the Design Review Board acted within its reasonable discretion by imposing the conveyance and voting requirements.

¶ 13    Owner now appeals these portions of the district court's judgment,[1] along with its determination that the Association was the prevailing party in the litigation and therefore entitled to an award of its costs and attorney fees.

## II.    Analysis

¶ 14    We begin by setting forth the standard of review and applicable law.  We then address the parties' arguments regarding the implied approval issues.  Finally, we turn to the court's conclusions that the improvements amounted to a modification of Unit 304's and the limited common element's boundaries, thus triggering the transfer and approval conditions, and its related conclusion that the imposed conditions were reasonable.

### A.    Standard of Review and Applicable Law

¶ 15    C.R.C.P. 56(h) permits a party to move for determination of a question of law, and the district court may decide the question if "there is no genuine issue of any material fact necessary for [its] determination."  *Mitton v. Danimaxx of Colo., Inc.*, 2023 COA 18, ¶ 9 (quoting C.R.C.P. 56(h)).  "Under C.R.C.P. 56(c), a party may move

---

[1] Owner does not appeal the district court's rejection of its waiver argument, so we do not address that issue further.

for, and a court may enter, summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Mitton*, ¶ 9. "We review orders under both rules de novo, applying the same standards as the district court." *Id.* (first citing *Bill Barrett Corp. v. Lembke*, 2020 CO 73, ¶ 11; and then citing *In re Estate of Davies*, 2022 COA 90, ¶ 11). When applying the undisputed facts, we draw all reasonable inferences therefrom in favor of the nonmoving party. *Timm v. Reitz*, 39 P.3d 1252, 1255 (Colo. App. 2001).

¶ 16 Homeowners' association (HOA) by-laws and declarations are contracts. *Briargate at Seventeenth Ave. Owners Ass'n v. Nelson*, 2021 COA 78M, ¶ 54; *see also Swan Creek Vill. Homeowners v. Warne*, 2006 UT 22, ¶ 50 ("[T]he Declaration constitutes a contract between the HOA and its members and . . . a recorded Declaration imparts notice of its contractual terms to all who acquire property subject to it.").

¶ 17 We review a district court's interpretation of a contract de novo, but we defer to the court's factual findings unless they are clearly erroneous. *French v. Centura Health Corp.*, 2022 CO 20,

¶ 24. When interpreting a contract provision, our primary goal is to give effect to the parties' intent. *Id.* ¶ 25.

## B. Deemed Approved Claim

¶ 18 Owner argues that the Association "was required to make a final determination on any design review application 'no later than 30 days' after receipt of the completed application." Because the Association did not respond within thirty days, Owner's argument continues, the Association's approval must be deemed granted. The Association contends that Owner's position misapprehends the controlling provision of the Declarations and the undisputed facts. The district court agreed with the Association's argument. We discern no error in that ruling.

¶ 19 Section 10.5 of the Declaration articulates the design review process, with a subsection describing the timing of design review decisions. The subsection reads, in relevant part, as follows:

> The Design [Review Board] shall make a determination on each application after receipt of a completed application with all required information. The Design [Review Board] may permit or require that an application be submitted or considered in stages, in which case a final decision shall not be required until after the final, required submission. . . . The Design [Review Board] shall notify the

9

Applicant in writing of the final determination on any application no later than 30 days after its receipt of a completed application and all required submissions. . . .

If the Design [Review Board] fails to respond to an application within [30 days], approval shall be deemed given.

¶ 20     The Declaration clearly states that the Board may receive an application in stages and that it will "make a determination . . . after receipt of a completed application."  Moreover, contrary to Owner's contention, the Declaration does not require approval of the application within thirty days of its original submission, but rather, within thirty days of the submission of a complete application and all required submittals.  Finally, the "deemed approved" language is triggered only if the Design Review Board "fails to *respond* to an application" within thirty days.  (Emphasis added.)

¶ 21     The district court found, based on undisputed facts, that the Design Review Board responded to the application or initiated communications with Owner on August 22 and September 1, 8, and 9, 2022, all within thirty days of the application's submission.  In the following months, there were numerous communications

between Owner and the Design Review Board. Owner did not upload the final requested documents until January 2023. Thereafter, the parties agreed to delay the Design Review Board's final vote on the application until March 2023. As evidenced by these communications, the Design Review Board first responded to the application twelve days after it was submitted and was clearly working with Owner and keeping it updated on the status of the application.

¶ 22 Given the clear language of section 10.5 of the Declaration and the undisputed facts, the district court did not err by rejecting Owner's argument that the Association had implicitly approved the application.

C. Definition of a Unit Applied by the District Court

¶ 23 In evaluating Owner's claim that CCIOA does not require a vote of the unit owners and first mortgagees as a condition precedent to approving the proposed improvements, the district court grounded its analysis in two different statutory definitions of a "unit."

¶ 24 The court, first quoting portions of section 38-33.3-209(2)(g), began by noting that CCIOA requires a condominium map to

11

evidence "[t]he location, with reference to established data, of the horizontal boundaries of each unit." The district court then focused on a definition of a unit, reasoning as follows:

> Describing a unit's boundaries in both generalized and specific terms is commonplace under Colorado law. *See* CCIOA [sic] §§ 103(3) and (4) (defining an "individual air space unit" as an "enclosed room" while empowering declaration drafters to include language providing that various other components outside of that "enclosed room" are also part of a unit); *see also* CCIOA [sic] § 105.5(1)(d) (requiring condominium declaration to describe boundaries of the unit).
>
> The CCIOA [sic] defines a "condominium unit" as "an individualized air space together with the interests in the common elements appurtenant to such a unit."

¶ 25    The problem with this analysis is that the court said it was based on the provisions of CCIOA, which provides the statutory framework for the formation and administration of the Residences. The statutes the court relied on, however, are not contained in CCIOA. Rather, they are located in CCIOA's predecessor: the Condominium Ownership Act (COA). *See* §§ 38-33-101 to -113, C.R.S. 2025.

12

¶ 26 CCIOA applies to common interest communities created after July 1, 1992. § 38-33.3-115, C.R.S. 2025. The COA does not apply to common interest communities created after that date. *Id.*; *see B.B. & C. P'ship v. Edelweiss Condo. Ass'n*, 218 P.3d 310, 315 (Colo. 2009). The Residences was created in 2007. Therefore, the COA definition of a unit has no relevance to the parties claims under CCIOA, and the district court clearly erred by applying the COA's definition of a unit to this dispute.

¶ 27 This error was not — as the Association asserts — a mere typographical error or a de minimis passing reference. The COA definition of a unit weighed heavily in the court's analysis of Owner's CCIOA and breach of contract claims.[2] In a section titled "Application of CCIOA," the district court returned to its focus on COA section 38-33-103, C.R.S. 2025:

> CCIOA [sic] defines a unit to be an "individualized air space." Here, [Owner] plans to enclose the [limited common element] with drywall or wood paneling and metal siding. [Owner]'s proposed improvements entail the construction of a roof over the [limited common element, as well as the installation of HVAC equipment to moderate the temperature within the newly created air space. [Owner]

---

[2] Claims three, four, and five in Owner's "Amended Complaint."

has exclusive use of the [limited common element], and as such, only [Owner] and [its] invitees and licensees have access to and use of the individual air space created by [Owner]'s proposed improvements. Accordingly, the Court finds and concludes that [Owner]'s proposed improvements fall within the definition of "condominium unit" under [section] 38-33-103 because [Owner]'s proposed improvements alter, change, and modify the individual air space of Unit 304.

¶ 28 Ironically, the district court did not cite or apply CCIOA's definition of a unit: "'Unit' means a physical portion of the common interest community which is designated for separate ownership or occupancy and the boundaries of which are described in or determined from the declaration." § 38-33.3-103(30), C.R.S. 2025. Unlike the COA, CCIOA's definition does not contain any reference to an "individual air space unit," § 38-33-103(1), (4)-(5), which played a central role in the district court's conclusion that the proposed improvements would alter the boundaries of Unit 304.

¶ 29 Owner argues that this error was material and impacted the district court's disposition of its CCIOA and breach of contract claims. Specifically, Owner notes that nothing in CCIOA or the Declaration requires that other unit owners and first mortgagees approve the enclosure of a limited common element unless the

14

applicant seeks to modify the boundaries of the unit or the limited common element. Thus, Owner emphasizes that the district court's improper reliance on COA's definition of a unit was essential because it allowed the district court to apply the "individual air space" framework which then drove its conclusion that the proposed improvements would alter the boundaries of Unit 304 and the associated limited common element.

¶ 30    In a perfunctory analysis, the Association's answer brief attempted to dismiss the district court's repeated references to the COA definition of a unit as a typographical error or inconsequential mistake. And the Association asserted that any error is harmless because "[w]hile the district court's analysis referred to 'individualized air space,' the CCIOA definition can readily be included in place of the COA definition with no impact on the district court's ruling." But the Association did not perform such an analysis.

¶ 31    Nonetheless, we may affirm a summary judgment ruling on any grounds supported by the record, even reasons not decided by the district court. *Roque v. Allstate, Ins. Co.*, 2012 COA 10, ¶ 7. In their briefs before the district court, neither party referenced the

COA; this is understandable because the district court's reliance on the COA was unexpected. Although the parties' initial appellate briefs addressed the court's error in relying on the COA, their written and oral arguments only briefly addressed whether the proposed improvements would modify the boundaries of Unit 304 and the associated limited common element under CCIOA and the terms of the Declaration. So, we asked them to submit supplemental briefs addressing these issues. We now have the benefit of those briefs and turn to the merits of that question.

### D. Unit Boundaries under CCIOA and the Declaration

Neither party disputes that the court should apply CCIOA's definition of a unit, although it differs from the definition provided in the Declaration. After reviewing both definitions, we conclude that CCIOA's definition of a "unit" and the Declaration's definition do not necessarily conflict. *See* § 38-33.3-104, C.R.S. 2025 ("Except as expressly provided in this article, provisions of this article may not be varied by agreement, and rights conferred by this article may not be waived. A declarant may not . . . use any . . . device to evade the limitations or prohibitions of this article or the declaration."); *Ryan Ranch Cmty. Ass'n v. Kelley*, 2016 CO 65, ¶ 25

("[D]ocuments concerning CCIOA common interest communities must comply with that statute's provisions; to the extent they conflict, the statute prevails."). Having reached this determination, we move forward with our analysis, grounded in the CCIOA definition of unit and related CCIOA provisions, but also drawing on the Declaration's definition to supplement our analysis.

¶ 33   Recall that, as relevant here, CCIOA defines a "unit" as "a physical portion of the common interest community which is designated for separate ownership or occupancy and the boundaries of which are described in or determined from the declaration." § 38-33.3-103(30). A declaration includes associated plats and maps. § 38-33.3-103(13). The plats and maps describe "[t]he location and dimensions of the vertical boundaries of each unit, and [t]he location, with reference to established data, of the horizontal boundaries of each." § 38-33.3-209(1)(f)-(g).

¶ 34   Section 38-33.3-103(16.5), defines a "[h]orizontal boundary" as "a plane of elevation relative to a described bench mark that defines either a lower or an upper dimension of a unit such that the real estate respectively below or above the defined plane is not a part of the unit." CCIOA defines a "[v]ertical boundary" as "the

defined limit of a unit that is not a horizontal boundary of that unit." § 38-33.3-103(32).

¶ 35 The Declaration specifies that a unit consists of "enclosed rooms . . . bounded by the unfinished perimeter walls and windows thereof." We read this description as consistent with CCIOA's definition of a unit's vertical boundaries. *See* § 38-33.3-103(16.5). The Declaration also includes within the definition of a unit "the upper surface of the concrete slab at the highest boundary of the unit . . . [including] any ceiling installed below the underside of the concrete slab that is the highest boundary of the unit." This description is consistent with CCIOA's definition of a unit's horizontal boundary.

¶ 36 With these definitions in mind, we turn to the changes created by the proposed improvements. Owner proposed enclosing 1,080 square feet of what is currently the uncovered portion of the space above the existing rooftop of Unit 304. The proposed improvements involve building vertical exterior walls and creating a new horizontal boundary through the addition of a new ceiling and rooftop above the existing roof of Unit 304. Moreover, the improvements include

18

substantial plumbing and electrical components to service the newly enclosed space.

¶ 37     While Unit 304's limited common element was already designated for Owner's exclusive use, we conclude that enclosing 1,080 square feet of the currently open space with exterior walls, windows, and a new ceiling and rooftop would manifestly modify the existing vertical and horizontal boundaries of Unit 304.

¶ 38     Despite these physical realities, the Owner argues that the improvements will not modify the existing boundaries of Unit 304, the related common element, or the common elements because it did not ask or intend to modify the boundaries.  But that begs the question at issue.  We may not analyze the improvements' impact based on Owner's subjective intent; rather, we must assess the improvements' physical and legal impact on the existing boundaries of Unit 304 and its limited common element.  For the reasons previously stated, that assessment leads to the conclusion that the proposed addition would modify those boundaries.

¶ 39     Owner next argues that the Association has previously approved rooftop improvements by other owners, including the additions of a pergola and a sauna, which also added exterior walls

and roofing to the units' limited common elements. Owner notes that the Association did not treat those improvements as modifications of the existing boundaries or require the type of approvals it has imposed on Owner's. So, Owner argues, the Association should not be permitted to do so here. We reject Owner's contention.

¶ 40    First, Owner did not appeal the district court's determination that the Association's past approval, without voting conditions, of limited patio amenities proposed and built by other units did not amount to a waiver of its right to impose such conditions here. Thus, Owner's attempt to undermine the approval conditions imposed on it based on past approvals of a pergola or sauna without conditions is unavailing.

¶ 41    Moreover, the improvements proposed here are not minor amenities. The scale of a pergola or sauna is materially different than creating a 1,080-square-foot structure, covered by a new rooftop at least eleven feet above the current rooftop of the building. We need not try to decipher the exact point at which the addition of limited improvements on an existing rooftop becomes a modification

of the unit's boundaries. It is sufficient to resolve this case for us to conclude that this proposed addition certainly does.

¶ 42 Finally, Owner argues that the proposed improvements would not change the status quo because the owner of each unit is currently responsible for maintaining its associated limited common elements. Even if we accept that assertion as true, CCIOA nonetheless requires the Association to maintain "[p]roperty insurance on the common elements . . . [in] the total amount of . . . not less than the full insurable replacement cost of the insured property less applicable deductibles at the time the insurance is purchased and at each renewal date." § 38-33.3-313(1)(a), C.R.S 2025. The estimated construction cost of the proposed improvements was $4.4 million. If, as Owner argues, the improvements would continue as limited common elements, the other owners — who collectively pay for the cost of insuring the limited common elements — would be adversely impacted. This too suggests that the proposed improvements must be treated as a material modification of the boundaries between Unit 304 and its limited common element.

¶ 43     These undisputed facts lead to the legal conclusion that the proposed improvements would modify the existing boundaries of Unit 304 and its limited common element.  Accordingly, the district court did not err by granting summary judgment in the Association's favor on this issue.

## E.     Conditions of Approval

¶ 44     The Declaration requires 50% of the first mortgagees to consent to any change in a unit's boundaries.  CCIOA provides that any transfer of the common elements — which include limited common elements — must be approved by 67% of the unit owners. § 38-33.3-312(1).  The Design Review Board approved the proposed addition subject to the conditions that Owner obtain (1) a transfer of the entire limited common element associated with Unit 304 from the Association; (2) the consent of 50% of the first mortgagees; and (3) the consent of 67% of the unit owners.

¶ 45     Building on its contention that the proposed improvements would not modify the boundaries of Unit 304 or its limited common element, Owner argues that it was unreasonable for the Association to approve the improvements subject to the noted conditions.  But we have already concluded that the proposed addition would modify

22

the boundaries between Unit 304 and its limited common element. Thus, we perceive no error in the district court's determination that the Association's approval requirements were reasonable.

### F. Attorney Fees and Costs

¶ 46    Based on its ruling, the district court concluded that the Association was the prevailing party in this litigation and awarded it attorney fees and costs. *See* § 38-33.3-123(1)(c)(I), C.R.S. 2025 (Subject to a limited exception not applicable here, "[i]n any civil action to enforce or defend this article 33.3 or the declaration, bylaws, articles, or rules and regulations, the court shall award reasonable attorney fees, actual costs, and actual costs of collection to the prevailing party."). Thus, we reject Owner's contention that it should be awarded attorney fees and costs for the trial court proceedings or on appeal.

¶ 47    Under section 38-33.3-123(1)(c), the Association is also the prevailing party on appeal and therefore is entitled to an award of appellate fees and costs. *See Accetta v. Brooks Towers Residences Condo. Ass'n*, 2021 COA 147M2, ¶¶ 50-51. Because the district court is uniquely suited to undertake the factfinding necessary to determine such an award, we exercise our discretion and remand to

23

the district court to determine and award the Association its reasonable appellate attorney fees and costs under C.A.R. 39.1 and C.A.R. 39(c)(1).

## III. Disposition

¶ 48 The judgment is affirmed, and the case is remanded to the district court to determine the Association's award of appellate attorney fees and costs.

JUDGE FOX and JUDGE HARRIS concur.